UNITED STATES of America,
Plaintiff–Appellant,

v.

John WOODLEY, Defendant–Appellee.

UNITED STATES of America,
Plaintiff–Appellee,

v.

John WOODLEY, Defendant–Appellant.

Nos. 92–30295, 92–30337 and 92–30309.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 2, 1993.

Decided Nov. 3, 1993.

As Amended Nov. 18, 1993.

John C. Carver, Carl Blackstone, Robert H. Westinghouse, Asst. U.S. Attys., Seattle, WA, for plaintiff-appellant-cross-appellee.

Peter D. Byrnes, Byrnes & Keller, Seattle, WA, for defendant-appellee-cross-appellant.

Before: WRIGHT, BEEZER, and HALL, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge.

The United States appeals an order imposing monetary sanctions against it. John M. Woodley cross-appeals his convictions for 36 counts of mail fraud, 18 U.S.C. § 1341, four counts of tax evasion, 26 U.S.C. § 7201, and four counts of filing false tax returns, 26 U.S.C. § 7206, as well as court-ordered restitution.

The parties raise a multitude of issues. We affirm in part and reverse in part.

## BACKGROUND

### I. Offenses

Woodley was an attorney driven by greed. His convictions stem from his representation of a former client, Elizabeth Lynn. Before her death, she formed a trust and appointed herself sole trustee. The trust became landlord of the White Pine Care Center, a Nevada nursing home, and charged White Pine rent for the use of its real property. She named her accountant, Gerald Shaw, Woodley and Thomas Stephens as successor co-trustees.

She also formed Imperial Bristlecone, Inc. and owned all of its 500 shares. Imperial took over White Pine's operation in 1984 after Lynn evicted her lessees. After her death in 1984, Woodley fraudulently converted Imperial's stock ownership by altering and falsifying corporate documents. He split the ownership with Shaw. As the "stockholders," Shaw and Woodley operated White Pine with the trust as its landlord.

In 1985, Woodley had his 250 shares appraised at $250,000 and donated them to the Elizabeth A. Lynn Foundation, a charitable entity formed by Lynn. Woodley claimed a $250,000 charitable deduction on his 1985 tax return, which he carried over from 1986 to 1988.

The government indicted him for mail fraud, tax evasion, filing false tax returns and conspiracy to defraud the United States.

### II. Government Misconduct

The government failed to timely disclose *Brady* and Rule 16 materials. The alleged *Brady* violations involved the government's late disclosure of four documents: the Fay letter, the Lynch note, the Vargas memo, and the Stephens note.

The Fay letter was an annotated copy of correspondence sent from White Pine's administrator, Russell Fay, to the Nevada Bureau of Health Facilities' administrator. Fay had described in it a proposed restructuring of Imperial and asked how this proposal would affect Imperial's entitlement to Medicaid and Medicare reimbursement. There was no corporate restructure. The Nevada Bureau forwarded the letter to the Health Care Financing Administration in San Francisco and noted on its copy where it had sent the letter.

In the Lynch note, the government's expert observed that the trust might qualify for Medicare and Medicaid reimbursement under a regulatory exception to the related organization principle. The Vargas memo recorded Shaw's attorney as saying that Shaw could not make up his mind on the facts. The Stephens note detailed a federal agent's interview with co-trustee Stephens.

Woodley requested *Brady* and Rule 16 materials late in 1991. The government disclosed the annotated Fay letter in February 1992, the Lynch and Vargas documents ten days before trial began, and the Stephens note when Woodley testified.

## ANALYSIS

We first address the merits of Woodley's appeal.

### I. Untimely Brady Disclosures and Prosecutorial Misconduct

Woodley argues that prosecutorial misconduct and untimely disclosure of exculpatory evidence prejudiced his defense, requiring reversal. Alternatively, he contends that the court should have used its supervisory powers to dismiss the indictment.

#### a. Reversal of Conviction

■ Woodley asserts that the late disclosures prejudiced his defense in two ways: (1) he was unable to refer to some documents in his opening statement and (2) he could not prepare adequately his experts before trial.

■ Contrary to the government's assertion, we find that these prejudice claims were timely raised. No "bright line rule" exists to determine whether a matter has been properly raised at trial. Rather, "the argument must be raised sufficiently for the trial court to rule on it." *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir.1989). Woodley moved for judgment of acquittal or for a new trial based partly on the government's actions. The court had an opportunity to review the validity of its prior orders.

■ We review de novo challenges to a conviction based on alleged *Brady* violations. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.1991). Evidence is material under the *Brady* rule only if "there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1984). Although disclosure must be made when it is still of substantial value to the accused, the prosecution need not produce *Brady* material before trial. *Aichele*, 941 F.2d at 764.

Woodley was not materially prejudiced. He used all of the disputed evidence effectively at trial. *See United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir.1988). The court also took the unusual step of allowing him to depose witnesses linked to the Fay letter. The court's action cured any potential for resulting prejudice.

#### b. Dismissal of Indictment

■ Woodley argues that the court erred in failing to dismiss his indictment under its supervisory powers. We are divided as to whether the denial of a motion to dismiss an indictment is reviewed de novo or for an abuse of discretion. *See United States v. Lunstedt*, 997 F.2d 665, 667 (9th Cir.1993). We need not decide which standard applies here because we affirm the ruling under either standard. *Id.*

A court may use its supervisory powers to dismiss an indictment for three reasons: "[1] to remedy the violation of recognized rights, [2] to deter illegal conduct and [3] 'to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury.'" *United States v. Garza–Juarez*, 992 F.2d 896, 905 (9th Cir.1993).

"The Court's power to dismiss an indictment [for] prosecutorial misconduct is ... rarely invoked." *United States v. Samango*, 607 F.2d 877, 881 (9th Cir.1979). Dismissing an indictment is so intrusive on a prosecutor's charging authority that it is justified only when the government's conduct substantially prejudiced the defendant and the government flagrantly disregarded the limits of professional conduct. *United States v. Lopez*, 989 F.2d 1032, 1041 (9th Cir.1993), *amended and superseded*, 4 F.3d 1455 (9th Cir.1993).

Judge Zilly clearly was irritated and concerned by the government's untimely disclosure of *Brady* material, its misrepresentation to the court and its inadequate investigation of the Health Care Financing Administration files. But he found that the government's "conduct was not widespread or flagrant." He also did not believe that such actions demonstrated a "long-standing pattern of misconduct" or that they prejudiced Woodley. He concluded correctly that these actions did not affect the trial's outcome substantially.

## II. *Void for Vagueness*

Woodley's mail fraud convictions were based on a violation of the "related-party" regulation.[1] 42 C.F.R. § 413.17 (1992). This regulation limits reimbursement to providers from related suppliers. Woodley argues that the convictions should be dismissed because the related party regulation as applied is void for vagueness and violates due process. His argument is meritless.

"Whether a statute or regulation is unconstitutionally vague is a question of law," which we review de novo. *United States v. Helmy,* 951 F.2d 988, 993 (9th Cir.1991) (inner quotations omitted), *cert. denied,* —— U.S. ——, 112 S.Ct. 2287, 119 L.Ed.2d 211 (1992).

### a. Regulatory Reimbursement Scheme

As White Pine's operator, Imperial was a "provider" of services under the Medicare Act. Its rent payments were reimbursable. 42 C.F.R. § 413.130(b).

If a provider receives services from a related organization, its repayment is limited to the supplier's cost, not the provider's expended amount. 42 C.F.R. § 413.17(a). The regulation limits a related party's rental reimbursement to the related supplier's actual costs, such as depreciation, mortgage interest and taxes. Organizations are "related" by common ownership or control. 42 C.F.R. § 413.17(b)(1)–(3).

### b. Analysis

█ Woodley argues that 42 C.F.R. § 413.17 as applied violated due process because (1) its application to these facts is unsettled, (2) it gives no warning of what is permitted, and (3) it permits arbitrary and discriminatory enforcement.

He relies on *United States v. Dahlstrom,* 713 F.2d 1423 (9th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984). We have limited *Dahlstrom* "as a case barring the [p]rosecution for *advocacy* of a tax shelter program in the absence of any evidence of a specific intent to violate the law because such prosecution is offensive to the first and fifth amendments." *United States v. Schulman,* 817 F.2d 1355, 1359 (9th Cir.1987) (alteration in original) (inner quotations omitted), *cert. denied,* 498 U.S. 813, 111 S.Ct. 51, 112 L.Ed.2d 27 (1990).

The critical question is whether the related party regulation "is unconstitutionally vague [because] it fails to provide a person of ordinary intelligence with notice of its meaning and the conduct it prohibits." *Helmy,* 951 F.2d at 993.

The Health Care Financing Administration concedes that the related party regulation is "difficult to apply" and may be "susceptible to misinterpretation and to subjective decisions." 44 Fed.Reg. 5479 (Jan. 26, 1979). It proposed revisions to eliminate the regulation's subjective application, but withdrew them to retain flexibility. 46 Fed.Reg. 5006 (Jan. 19, 1981).

Notwithstanding these comments, we have on occasion clarified "significant" ownership as used in the related party regulation. *See e.g., American Hosp. Management Corp. v. Harris,* 638 F.2d 1208 (9th Cir.1981) (hospital, as lessee, not entitled to full rent reimbursement where 16 partners in lessor limited partnership owned 50% of hospital); *Goleta Valley Community Hosp. v. Schweiker,* 647 F.2d 894 (9th Cir.1981) (parties related because seven hospital trustees had 70% interest in provider subsidiary).

Shaw and Woodley controlled 66% of the trust as co-trustees and 100% of Imperial. A "person of ordinary intelligence" would know this amounted to "significant" ownership and control under the regulations, the case law and the Provider Reimbursement Manual. Attorney Woodley had fair warning that his actions were prohibited.

The regulations do not allow arbitrary and discriminatory enforcement. A "good-faith

1. Woodley defrauded the Department of Health and Human Services by making false representations concerning his claimed ownership in Imperial and his relationship as trustee for its lessor, the trust. Because he concealed Imperial's true ownership status and its relation to the trust, Imperial received full rent reimbursement. Had he complied with the related party method, the rent reimbursement would have been significantly less. His scheme resulted in excess payments totaling almost $500,000.

claim for reimbursement, made without intent to defraud the government, would not support a conviction." *United States v. Alemany Rivera,* 781 F.2d 229, 233 (1st Cir. 1985), *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986). The challenged regulation provides "minimal guidelines" to govern its enforcement. *See Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Any uncertainty over the relatedness of the parties bears on the issue of requisite intent. Without the requisite intent, Woodley would not have been convicted.

Because some experts may have reached conflicting opinions at trial does not render the regulation void for vagueness. "[M]arginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense." *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

### III. *"Entrapment by Estoppel" Jury Instruction*

Woodley says the court erred in refusing his proposed jury instructions on entrapment by estoppel. He argues that he solicited the government's advice in the Fay letter, it never responded, but continued to reimburse all of Imperial's rent.

We have not resolved whether the denial of a jury instruction is reviewed de novo or for an abuse of discretion. *United States v. Streit,* 962 F.2d 894, 897 (9th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992). We need not decide which standard of review applies as we affirm under either. *Id.*

Woodley fails to make a prima facie showing of entrapment by estoppel. *See United States v. Brebner,* 951 F.2d 1017, 1024 (9th Cir.1991) (setting out test for entrapment by estoppel defense). His reliance on governmental inaction is insufficient to establish this defense. *See Lavin v. Marsh,* 644 F.2d 1378, 1382 (9th Cir.1981) ("mere failure to inform or assist" not enough to invoke estoppel against government).

### IV. *Sufficiency of the Evidence*

Woodley contends that there was insufficient evidence to support his convictions for tax evasion and filing false tax returns.

There is sufficient evidence to support a conviction if any rational trier of fact, reviewing the evidence in the light most favorable to the prosecution, "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

Woodley's convictions were based on circumstantial evidence because his deceased client was the only person who could have contradicted him. Circumstantial evidence and inferences drawn from it may sustain a conviction. *United States v. Reyes–Alvarado,* 963 F.2d 1184, 1188 (9th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 258, 121 L.Ed.2d 189 (1992).

The government proved that Woodley, a 47–year–old attorney, admitted to the Washington bar in 1973, with a Masters in Business Administration, used his position as counsel and co-trustee for unjust enrichment. The record demonstrates sufficient evidence such that a reasonable jury could convict him of tax fraud and filing false tax returns.

### V. *Donations of Stolen Property and Charitable Deductions*

#### a. Motion for Judgment of Acquittal

Woodley maintains that the court erred by denying his motion for a judgment of acquittal on the tax counts. He relies on *James v. United States,* 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961), to argue that even if he stole the Imperial stock, he is entitled to deduct its donation as a charitable contribution. Such deductions are governed by 26 U.S.C. § 170. The district court ruled that a charitable deduction for stolen property was legally impossible. We agree. We review under the same standard applied to a sufficiency of the evidence challenge. *United States v. Shirley,* 884 F.2d 1130, 1134 (9th Cir.1989).

The tax court has held that a taxpayer must own the property before donating it to a charity and taking the appropriate deduction. *Hunter v. Commissioner,* 51 T.C.M. 1533, 1536, 1986 WL 21585 (1986). Further, "[t]he right to beneficial enjoyment of the property, rather than possession of the property, determines whether a taxpayer is recognized as the owner of property for Federal tax purposes." *Id.*

Woodley's reading of our holding in *Sammons v. Commissioner,* 838 F.2d 330 (9th Cir.1988), is too broad. There, the taxpayers bought eagle artifacts, donated them and claimed a charitable deduction. We held that the taxpayers had a sufficient ownership interest in the artifacts. We noted that the sale may have been illegal and voidable, but "no one [was] seeking, or defending, enforcement of the contract of purchase or the subsequent gift." *Id.* at 336.

In contrast, the government showed that Woodley had acquired the Imperial stock fraudulently. Because he stole it, he did not have the rightful ownership required for a charitable deduction.

Allowing a charitable deduction for stolen property contravenes public policy and would encourage thievery. When Congress is silent, we have upheld a disallowance when allowing a deduction would frustrate public policy that bars specific conduct. *Id.*

### b. Adequate Jury Instructions

■ Woodley says the district court inadequately instructed the jury on stock ownership. Specifically, he says that the court omitted the subjective intent requirement and erred by rejecting his proposed instruction.

The court gave modified instructions that allowed the jury to consider Woodley's subjective good faith belief that he was entitled to the deduction. The court explained to the jury that Woodley need not possess a stock certificate to prove ownership. Rather, he rightfully owned the stock if "he purchased or agreed to purchase" it from Lynn.

■ We review de novo whether the court's instructions adequately presented the defendant's theory. *United States v. Mason,*

902 F.2d 1434, 1438 (9th Cir.1990). If instructions fairly and adequately cover the elements of an offense, we review their precise formulation for an abuse of discretion. *United States v. Lunstedt,* 997 F.2d 665 (9th Cir.1993).

Woodley has not told us why the court's instructions are inadequate. The court allowed him to testify and argue his defense theory. The court's instructions covered the issues sufficiently to guide the jury.

### VI. *Restitution Order*

■ Woodley contends that the court erred in ordering a restitution payment of $239,691.33 for excess rent reimbursement. We review a restitution order for an abuse of discretion if it is within the statutory framework. *United States v. Hicks,* 997 F.2d 594 (9th Cir.1993).

#### a. Imposition of Restitution

The court did not cite the statute under which it ordered restitution. The order was valid under the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, which applies to violations of Title 18, including Woodley's mail fraud convictions. *United States v. Parrott,* 992 F.2d 914, 916 (9th Cir.1993).

Under the VWPA, a court may order restitution so long as payment is made to a

> positively identifiable victim of a fraudulent scheme in a definite amount that is supported by the evidence, limited by the victim's actual losses, and judicially established in a proceeding in which the defendant has the opportunity to refute the amount ordered.

*United States v. Cloud,* 872 F.2d 846, 855 (9th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989).

The court met all requirements. The amount was supported by evidence. It identified Medicaid and Medicare as the mail fraud victims. Experts calculated Medicaid and Medicare's overpayments to Imperial at $477,001 for the years 1984 to 1989. The court ordered that Woodley pay the lesser amount, $239,691.33, for the reimbursements

underlying his convictions. Woodley heard the experts testify and had notice of the loss caused. He saw the presentence report and had the opportunity to challenge the restitution.

### b. Amount of Restitution

Woodley contends that even if Imperial and the trust were related parties, Imperial was entitled to full rent reimbursement. He argues that the court should have (1) looked to the lease in force before Imperial took control and a related party relationship formed, and (2) applied the Consumer Price Index adjustment allowed under that lease to derive the allotted level of reimbursement. He maintains that figure would have been $16,000, the amount that was paid each month for rent.

His argument is without merit. He relies primarily on *Richlands Medical Ass'n v. Harris*, 651 F.2d 931 (4th Cir.1981). In *Richlands*, the parties were unrelated organizations when the lease was signed. *Id.* at 936. In this case, Lynn terminated the prior lease for nonpayment before Imperial took over as White Pine's operator. From its first day as operator, Imperial was related to the trust.

A related provider is limited to its supplier's actual costs even though the charged rent is fair. We have held that once organizations are deemed related, the regulation "operates as a prophylactic rule and defines any charges [exceeding the supplier's] actual costs as per se unreasonable." *Goleta Valley*, 647 F.2d at 897.

The court did not err in ordering restitution or in its calculations.

### VII. *Sanctions Against the Government*

■ The court ordered the government to pay $6,916.64 as attorneys' fees and costs related to the Fay letter discovery process. It imposed this sanction under the Western District of Washington Local Rule GR 3(d), the Federal Rule of Criminal Procedure 16(d)(2) and its supervisory powers. The government appeals and argues that the sanctions were unwarranted and barred by sovereign immunity.

■ We review de novo whether sovereign immunity bars the imposition of sanctions. *Hall v. Bolger*, 768 F.2d 1148, 1150 (9th Cir.1985). A court may impose money awards against the United States only under an express waiver of sovereign immunity. *See Block v. North Dakota*, 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). There was no express waiver here.

### a. Local Rule GR 3(d)

Few cases discuss sovereign immunity in the context of fees or costs awarded against the United States under a local federal rule. The few courts that have discussed this issue conclude that a local rule is insufficient because it does not waive sovereign immunity. *See United States v. 50.50 Acres of Land*, 931 F.2d 1349, 1356 n. 5 (9th Cir.1991).

We hold that assessing monetary sanctions against the government under this local rule is subject to the same infirmity. There was no explicit waiver of sovereign immunity. The court incorrectly levied sanctions under Local Rule GR 3(d).

### b. Federal Rule of Criminal Procedure 16(d)(2)

■ We have not addressed whether sovereign immunity is waived when monetary sanctions are imposed against the government under the Federal Rules of Criminal Procedure. We find no explicit waiver of sovereign immunity under the rules.

We have affirmed money penalties against the government under Federal Rules of Civil Procedure 11 and 37(b). *See Mattingly v. United States*, 939 F.2d 816, 818–19 (9th Cir.1991) (upholding Rule 11 sanctions); *United States v. National Medical Enters., Inc.*, 792 F.2d 906, 910–11 (9th Cir.1986) (upholding Rule 37(b) sanctions). But Civil Rules 11 and 37(b) expressly provide for monetary sanctions. Because Criminal Rule 16(d)(2) provides no independent authority for a monetary sanction, we decline to recognize a waiver of sovereign immunity in the criminal context.

*Zambrano v. City of Tustin*, 885 F.2d 1473, 1481 (9th Cir.1989); *see also International Video Corp. v. Ampex Corp.*, 484 F.2d

634, 637 (9th Cir.1973) (attorney's fees award "ordinarily improper in the absence of a statute or under the most unusual circumstances").

Civil Rules 11 and 37(b) expressly provide for monetary sanctions. Rule 11 requires a court to impose upon an offending party "an appropriate sanction, which may include an order to pay to the other party ... the amount of the reasonable expenses incurred because of the filing of the pleading, ... including a reasonable attorney's fee." Fed. R.Civ.P. 11. Similarly, Rule 37(b) provides that a court may sanction a party for failing to comply with a discovery order by requiring the party "to pay the reasonable expenses, including attorney's fees, caused by the failure" to comply. Fed.R.Civ.P. 37(b)(2).

Unlike these Civil Rules, Federal Rule of Criminal Procedure 16(d)(2) provides no independent authority for a monetary sanction against the government. The Rule only provides a court with authority to "prescribe such terms and conditions as are just" to remedy a violation of a discovery order. Fed.R.Crim.P. 16(d)(2). We think such language is insufficient to constitute an express waiver of sovereign immunity.

We also note that, in general, "federal courts cannot ... alter the uniform system of cost-bearing created by Congress." *Zambrano v. City of Tustin*, 885 F.2d 1473, 1481 (9th Cir.1989); *see also International Video Corp. v. Ampex Corp.*, 484 F.2d 634, 637 (9th Cir.1973) (attorney's fees award "ordinarily improper in the absence of a statute or under the most unusual circumstances"). Congress did not extend "any roving authority to the Judiciary to allow counsel fees as costs or otherwise wherever courts might deem them warranted." *Zambrano*, 885 F.2d at 1481.

The district court said that it sanctioned the government to send a "significant and strong message" that it would not tolerate such misconduct. But, it found that only the Fay letter was clearly *Brady* material. It took the unusual step of allowing Woodley's attorney to depose those witnesses with knowledge of the letter. This cured any possible prejudice.

#### c. Supervisory Powers

Sovereign immunity does not bar a court from imposing monetary sanctions under an exercise of its supervisory powers. These powers are judicially created to remedy a violation of recognized statutory, procedural, or constitutional rights, and to "deter future governmental misconduct and protect the integrity of the judicial process." *United States v. Simpson*, 927 F.2d 1088, 1092 (9th Cir.1991) (Nelson, D.W., J., concurring).

But "the separation-of-powers principle[s] suggest[ ] that the creation of a rule by supervisory power can be justified only when a recognized right has been violated." *United States v. Gatto*, 763 F.2d 1040, 1046 (9th Cir.1985). The sanctions imposed here were not justified because the court identified no violation of any statute, constitutional or other recognized right except, perhaps, Rule 16 as a basis for exercising its supervisory powers. The fact that Rule 16 allots "specific remedies for its violation eliminates any justification for an exercise of supervisory power to create any other remedy for it." *Id.*

We realize that courts need to be vigilant in ensuring that all lawyers, including government attorneys, maintain ethical standards and fulfill their roles as officers of the court. But alternatives to monetary sanctions, such as holding the attorney in contempt or reporting the misconduct to the state bar for disciplinary proceedings, are more proper remedies. Also, an Office of Professional Responsibility exists to serve the United States Department of Justice. 28 C.F.R. § 0.39–0.39e (1992). That office has the power to take appropriate measures for reported *Brady* violations.

We uphold the convictions and restitution order and reverse the court-imposed sanctions against the government.

**AFFIRMED in part, REVERSED in part.**